AO (Rev. 5/85) Criminal Complaint

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

09 AUG 24   PM 12: 57

CLERK
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

UNITED STATES OF AMERICA

vs.

JOHN S. MORGAN, and
MARIAN I. MORGAN

**CRIMINAL COMPLAINT**

**8:09 M J 13 8 4 TGW**

CASE NUMBER:

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.  Between in or about January, 2006 and in or about June, 2009, in Sarasota County, in the Middle District of Florida, and elsewhere, defendants did knowingly and willfully commit wire fraud, in violation of Title 18, United States Code, Section 1343.  I further state that I am a(n) Special Agent with FBI, and that this Complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof:  ☒ Yes   ☐ No

Signature of Complainant
Barbara Jean Collazo

Sworn to before me and subscribed in my presence,

August 24, 2009                                    at        Tampa, Florida

THOMAS G. WILSON
United States Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

N:\_Criminal Cases\M\Morgan, John_2009R01675_TAZ\f_complaint.wpd

8:09 MJ 1384 TGW

## CRIMINAL COMPLAINT

I, Barbara Jean Collazo, Affiant, being duly sworn, hereby depose and say that:

1.      I am a Special Agent of the Federal Bureau of Investigation (FBI). I have been a Special Agent of the FBI since April 2002, and am currently assigned to the Sarasota, Florida Resident Agency. As a Special Agent, I am responsible for investigating violations of federal criminal laws, including violations involving wire fraud. I have received specialized training in this type of fraud, as well as other types of white collar crimes. The purpose of this Affidavit is to establish probable cause in support of an application for complaint. I, therefore, have not included every fact discovered through this investigation.

2.      This affidavit is in support of a complaint for an arrest warrant, for John S. Morgan and Marian I. Morgan and it will establish probable cause for violation of Title 18, United States Code, Section 1343, wire fraud. To establish a violation of the wire fraud statute, the government must prove that (1) the defendant knowingly devised or participated in a scheme to defraud, or a scheme for obtaining money or property by means of false pretenses, representations or promises relating to material facts; (2) the defendant did so willfully and with an intent to defraud; and (3) the defendant transmitted or caused to be transmitted in interstate or foreign commerce, into or out of the Middle District of Florida, some wire or radio communication for the purpose of executing the scheme to defraud. I submit that the facts set forth in this affidavit establish probable cause that from in or about January, 2006, to in or about June, 2009, at Sarasota County, in the Middle District of Florida, and elsewhere, the defendants John S. Morgan and Marian I. Morgan, knowingly and willfully devised and

intended to devise a scheme and artifice to defraud investors, and a scheme to obtain money and property from investors by means of false pretenses, representations and promises relating to material facts, in connection with the promotion and operation of a purported prime bank instrument trading program, and for the purpose of executing said scheme to defraud, the defendants knowingly transmitted and caused to be transmitted in interstate and foreign commerce, into the Middle District of Florida, certain wire and radio communications, namely, (1) on or about June 12, 2006, a wire-transfer in the amount of approximately $200,000, from a bank in Denmark to a bank account in Sarasota, Florida; (2) on or about June 20, 2006, a wire-transfer in the amount of approximately $200,000 from a bank in Denmark to a bank account in Sarasota, Florida; and (3) on or about September 15, 2008, a wire-transfer in the amount of approximately $100,000 from a bank in Denmark to a bank account in Sarasota, Florida.

3.    Information obtained in the Affidavit is based, in part, by an investigation conducted by your Affiant and Special Agent Diane Knott, Internal Revenue Service, Criminal Investigation (IRS-CI).  Special Agent Knott has been employed by IRS-CI for 21 years and is currently assigned to the Sarasota, Florida office.  Special Agent Knott has received specialized training in white collar crimes and money laundering.

4.    Since April 2009, your Affiant and Special Agent Knott have been aware of an ongoing investigation by the Securities and Exchange Commission of John S. Morgan, a resident of Sarasota, Florida (date of birth 11/22/1958, U.S. passport #047909726 issued in 2006, and Florida DL #M625-477-58-422-0) and Marian I. Morgan, a resident of Sarasota, Florida (date of birth 09/21/1954, U.S. passport

#422074358 issued in 2008, and Florida DL #M625-549-54-841-0) who, together, were doing business as Morgan European Holdings (MEH), a Danish entity that is also known as Money Talks, Inc.; Steven E. Bowman, a resident of Omaha, Nebraska, principal of Bowman Marketing Group, Inc. (BMG); and Thomas D. Woodcock, Jr., a resident of Rockwall, Texas, principal for Woodberry Capital Enhancement Group, who created MTD Group, LLC (MTD). The function of said companies was for the purpose of soliciting investors into a fraudulent prime bank instrument trading program (hereinafter referred to as prime bank trading) scheme that guaranteed investors' principal while providing returns of 14% or more per month. These companies/ individuals received millions of dollars from defrauding investors by offering and selling investments in fictitious prime bank trading. John S. Morgan, Marian I. Morgan and Stephen E. Bowman made comforting and lulling statements to investors, representing that the prime bank trading program was successful and that payments to investors were imminent.

5. Prime bank trading programs, such as that offered by Woodcock, MTD Bowman, BMG, the Morgan's and MEH, are fictitious. The U.S. Securities and Exchange Commission, the Federal Reserve Bank, the International Monetary Fund and numerous other federal and international authorities have all publicly denounced prime bank trading schemes in easily obtainable information. These schemes work by raising approximately $10 million in U.S. currency to invest in "high yield" prime bank trading platforms. The MTD Group offering documents describe these platforms as involving "a European bank buy/sell of bank notes in the top fifty financial institutions or the Federal Reserve if the program is based in the United States."

## BACKGROUND

6.     In August of 2009, your Affiant and Special Agent Knott received documentation from the U.S. Securities and Exchange Commission (SEC), including the Declarations of Kerry M. Matticks, accountant, Zachary T. Carlyle, attorney, both with the Division of Enforcement of the SEC in the Denver Regional Office, and of witnesses who placed monies with MTD, BMG and/or MEH for the purpose of participating in prime bank trading.  These Declarations and supporting documentation revealed the following information:

7.     In early 2006, Thomas D. Woodcock solicited investments in prime bank trading through MTD.  Woodcock raised approximately $7.79 million from at least 150 investors nationwide through the MTD program.  Woodcock distributed offering materials to investors which described the investment.

8.     The offering materials distributed by Woodcock described the operation of a classic prime bank trading scheme.  For example, some of these materials described how the "top fifty financial institutions" or the U.S. Federal Reserve Banks trade with each other to "artificially inflate the money supply" available for international commerce.

9.     According to the offering materials distributed by Woodcock, participants were to provide money to supply "the margin" for a trader to pass a "debenture or treasury" to the end user, generating returns through the leveraging of financial instruments.

10.     The materials distributed by Woodcock stated that these programs were secret but real, even though, the "official position" of the U.S. government was that

such prime bank trading platforms did not exist so as "to increase the participation in traditional investments and reduce the flight of capital from the United States."

11.    Woodcock's materials stated that Stephen Bowman would act as the "Administrator" for the prime bank trading.

12.    In approximately April, 2006, Woodcock decided not to continue with managing the prime bank trading.  Instead he offered investors the opportunity to transfer their investment to Bowman's entity, BMG, or another entity.  The majority of investors agreed to transfer their investments from MTD to BMG, and MTD made the necessary financial transfer of approximately $5.6 million.

13.    Bowman assured investors that money transferred to BMG would be invested in the same type of prime bank trading platform as described in the MTD offering materials.

14.    During 2006 and 2007, Bowman, in addition to the MTD transfers, raised approximately $6 million in additional funds from these same investors and new investors for the purposes of investing in prime bank trading.

15.    More specifically, from approximately February to April 2006, Investor John R. Long, wired approximately $225,000 to MTD for the purpose of investing in "high yield" prime bank trading.  In April 2006, MTD notified Long that MTD would be disbanded and his funds could be redirected to BMG for the same high yield prime bank trading program.  Long agreed to transfer his funds, and wired an additional $22,000 to BMG.

16.    Long signed two agreements with BMG which stated that Long agreed to "loan" money to "participate in investment activity" for a limited period, with a projected

"return on investment" per month.  The agreements also included a "guarantee of principal provided by the bank, fund manager or both."  In the first agreement dated February 21, 2006, Long agreed to loan BMG $25,000 for one year with projected earnings of 14% per month.  In the second agreement dated April 27, 2006, Long agreed to loan BMG $222,000 for 90 days with projected earnings of 30% per month.

17.   BMG entered into written agreements with MEH, authored by John S. Morgan, stating that it was providing funds as a "Private Loan" to be used "primarily for Loan Provisioning for use in participation of a bank trade program."

18.   On February 8, 2006, Stephen Bowman entered into an "Official Private Contractual Loan Agreement" with MEH/Luxembourg Fund in which Bowman loaned MEH $100,000.00 for a 300% "net lender yield."  On May 1, 2006, BMG entered into an "Official Private Contractual Loan Agreement" with MEH/Brussels Fund in which BMG loaned MEH $3,000,000.00 for a 200% "net lender yield."  The agreement also stated, "Principal is never put at risk and is held in escrow for the duration of the transaction." These written agreements stated that the yield plus principal, was to be paid within 90 to 120 days from the start of the program.

19.   These agreements included wiring instructions to send the funds to lawyer Eli Heckscher in Denmark, attention Danske Bank.  The instructions indicated that it was "VERY IMPORTANT" to send both an email as well as a fax to Attorney Eli Heckscher and Marian I. Morgan to confirm that the wire was sent.

20.   Long received approximately $9,625.00, represented to be returns from the 14% investment agreement, but stopped receiving returns after July 2006.  Based

on this initial return, Long made additional deposits to BMG during 2006 and 2007 totaling $105,000.00.

21.     Bowman represented to Long in writing, phone calls and face-to-face meetings that his principal was guaranteed.  Long was also told that his funds were invested with MEH located in Denmark, for the purpose of participating in European high-yield bank debenture trading programs.  Bowman further explained that the principal was being held safely in an escrow account of MEH's Danish lawyer, Eli Heckscher.  Bowman told Long the principals of MEH were John S. Morgan and Marian I. Morgan of Sarasota, Florida.

22.     Long did not receive his principal or promised return of investment (with the exception of the $9,625) and was offered countless explanations for delays in issuing returns or refunding his principal, to include claims of inexplicable bank delays in Europe, Patriot Act compliance, MEH Attorney Eli Heckscher's vacation schedule, and issues with a humanitarian foundation in Europe involved in the bank trading business.

23.     On November 14, 2007, over one year after Long received his only interest payment of $9,625, he traveled to Omaha, Nebraska, to obtain an update of the status of his funds.  Long met with Bowman.  Bowman facilitated a phone call between Long and John S. Morgan in which Morgan claimed that the delays in payment had to do with a large "foundation" involved in the trading program, and that the funds invested with MEH were 100% safe and had never been at risk.

24.     Long relied heavily on statements provided by Bowman in which Bowman claimed that he had conducted extensive due diligence regarding MEH and its

principals, John S. Morgan and Marian I. Morgan, and determined they were reputable and had a solid track record of successful high yield bank bond trading programs.

## MISREPRESENTATIONS

25.    Prime bank trading programs such as those offered by Woodcock, Bowman, BMG, the Morgan's and MEH are fictitious. The Securities and Exchange Commission, the Federal Reserve Bank, the International Monetary Fund and numerous other federal and international authorities have all publicly denounced these prime bank trading programs as fictitious and fraudulent.

26.    The investors' funds were not used for the intended purpose and represented of prime bank trading. Investor funds were instead diverted to bank accounts controlled by John S. Morgan and Marian I. Morgan and used for personal benefits, including the purchase of vehicles and real estate.

27.    On November 14, 2007, when John S. Morgan declared to Long that his principal investment was safe, the balance in the Danske Bank, Eli Heckscher account was $68, 802.94.

28.    Notes from a meeting on June 11, 2008, between and among Attorney Leslie Rabuchin, Attorney Max Krasnik and Attorney Eli Heckscher, reveal that Heckscher advised that he received the invested monies into his escrow account. At the instruction of his clients (John S. Morgan and Marian I. Morgan), he paid a portion of the funds to investors and the remaining funds were paid out directly to the Morgans' private bank accounts abroad. (As this meeting took place in Denmark, Affiant believes abroad to mean the U.S.) He further advised that he had no knowledge of any bank

working for the Morgans and that no funds were ever transferred to an MEH bank account for the purposes of prime bank trading.

29.    After the original investments were made and up until at least June 2009, Marian I. Morgan continued to lull investors into remaining complacent by claiming that fabulous returns on their investments were imminent, but that administrative problems were causing delays.

30.    Marian I. Morgan warned in an e-mail to investors, dated February 9, 2007, that an "SEC/FBI investigation" will cause the "powers to be to FREEZE all funds and years and years will go by before they "complete" their investigation.  When they are done they will CONFISCATE all funds as fees for their services and the participants will get one big GOOSE EGG, NADA, NOTHING, ZERO."

31.    Marian I. Morgan, in an e-mail to investors dated December 22, 2008, stated, "Promises are being kept and not broken."

32.    In a December 30, 2008, e-mail to investors, Marian I. Morgan wrote, .... "not to scare you but to assure you that no one has stolen our funds and we are not involved in any scam."....."Please know that your principal is SAFE."

33.    On December 30, 2008, the balance in the Danske Bank, Eli Heckscher account, was $44.02.

## FINANCIAL ANALYSIS

34.    Your Affiant and Special Agent Knott have traced the flow of funds related to the following accounts: Bank of The West, Account # xxx-xx1337 in the name of Bowman Marketing Group (BMG); Danske Bank, Account # xxxx xxxx xxxx 8545 50, in

the name of Advokat Eli Heckscher,; and Bank of America, Account # xxxxxxxx2644, in the name of ProTap Professionals LLC .

35.    The address on the ProTap Professionals LLC account is 7350 S. Tamiami Trail, Apt. 208, Sarasota, Florida  34231.  The sole signators on the account are John S. Morgan and Marian I. Morgan.  This address is located in the Middle District of Florida.

36.    On April 27, 2006, Long wired $22,000 to BMG, Bank of the West, Account # xxx-xx1337.

37.    On May 1, 2006, MTD wired funds in the amount of $5,863,963.64 to BMG, Bank of the West, Account # xxx-xx1337.

38.    From about February to May 2006, BMG wired approximately $4.5 million to Advokat Eli Heckscher, Danske Bank, Account xxxx xxxx xxxx 8545 50.  Specifically, BMG wired $3,000,000 to Advokat Eli Heckscher on May 2, 2006.

39.    From about January 2006 to September 2008, Eli Heckscher wired approximately $5.2 million from Advokat Eli Heckscher Danske Bank, Account xxxx xxxx xxxx 8545 50 to ProTap Professionals, Bank of America Account xxxxxxxx2644. Specifically, exclusive of transaction fees, Advokat Eli Heckscher wired funds from the Danske Bank account to the Bank of America Pro-Tap Professional account in the following amounts: $200,000 on June 12, 2006; $200,000 on June 20, 2006; and $100,000 on September 15, 2008.

## SEC INVESTIGATION

40.     On June 11, 2009, the SEC filed a civil complaint and motion for a temporary restraining order against defendants including John S. Morgan, Marian I. Morgan, and Morgan European Holdings, alleging ongoing violations of the federal securities laws. (SEC v. John S. Morgan et al., M.D.F.L, 8:09-cv-1093-T-26EAJ) U.S. District Court Judge Richard Lazzara issued orders finding that the SEC had presented evidence establishing a prima facie case of securities fraud and other violations by the Morgans and "a strong likelihood that the SEC prevail at trial on the merits". The court issued preliminary injunctions against the Morgans, froze the Morgans' assets, ordered the Morgans to repatriate all foreign assets to the court, and ordered the Morgans to provide an accounting of all investor funds.

41.     On June 25, 2009, a preliminary injunction hearing was attended by John S. Morgan and Marian I. Morgan. SEC attorney Zachary Carlyle viewed photographs on file with the Florida Department of Motor Vehicles (FDMV) and confirmed that the Morgans on file with the FDMV are the same Morgans who attended the preliminary injunction hearing. The address submitted by both John S. Morgan and Marian I. Morgan to the FDMV is 7350 S. Tamiami Trail, Apt. 208, Sarasota, Florida 34231, the same address on record with Bank of America for the ProTap Professional account.

42.     The SEC subsequently presented evidence to the court showing that the Morgans had failed to repatriate assets or provide an accounting pursuant to the court's order and that they were continuing to lull investors and claim that funds would be distributed in violation of the court's order. On July 7, 2009, the court ordered John S.

Morgan and Marian I. Morgan to appear on July 16, 2009, to show cause why they should not be held in contempt of court for their willful failure to comply with the orders of the court. The Morgans did not appear and the court issued a bench warrant on July 16, 2009, for their arrest, which remains outstanding. The SEC later learned that, prior to the hearing, the Morgans had fled to Switzerland.

43. On August 14, 2009, Interpol notified the United States Attorney's Office in the Middle District of Florida that John S. Morgan and Marian I. Morgan had been arrested in Sri Lanka for attempting to open a bank account with a fraudulent document.

44. On the ABC 7 MySuncoast.com website, in response to an article entitled "Sarasota Couple Accused in $11 Million Scheme", an individual identified as Marian wrote a comment on June 16, 2009, stating that "we had no choice but to fly to Tampa for the hearing on the 25th..... Bottom line: we high tailed it out of Tampa and flew back overnight to Europe so that we could focus on getting the MEH stuff done once and for all and not have it hanging over our heads. They cannot serve us in Europe. They do not have an attorney to serve in the USA. Please do not be worried about your funds. They are completely out of the USA jurisdiction and we will have all funds wired before any one can even begin to look at anything."

45.     Based on the foregoing, the undersigned respectfully submits that there is probable cause to believe that John S. Morgan and Marian I. Morgan committed wire fraud in violation of Title 18, United States Code, Section 1343.

This completes my affidavit.

_____
Barbara Jean Collazo
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
this ___24___ day of August, 2009.

_____
THOMAS G. WILSON
United States Magistrate Judge

N:\_Criminal Cases\M\Morgan, John_2009R01675_TAZ\f_affidavit for criminal complaint.wpd